IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-02014-WYD-CBS

LUFT FARMS, LLC, a Colorado limited liability company;
ALLEN REUTER; and
CONNIE REUTER,

      Plaintiffs,

v.

THE WESTERN SUGAR COOPERATIVE, a Colorado Cooperative Corporation,

      Defendant.

---

## ORDER

---

THIS MATTER came before the Court during a hearing on November 21, 2008 on Plaintiffs' Motion for Preliminary Injunction [doc. #10, filed October 27, 2008]. Defendant submitted a response on November 10, 2008 [doc. #21].  That same day, Defendant also filed a Motion to Dismiss [doc. #19], and it incorporated that Motion into its response by reference.  Plaintiff replied on November 14, 2008 [doc. #25].  Each side also supplemented its briefs, with Plaintiffs filing a supplement on November 24, 2008 [doc. #26] and Defendant filing supplements on November 19, 2008 [doc. #33] and November 25, 2008 [doc. #36].  The Court, having considered the motion, response, reply, supplements, pertinent exhibits, and argument on the motion during the hearing, enters the following written Order.

## FACTUAL BACKGROUND

In April 2008, Defendant The Western Sugar Cooperative ("Cooperative") commenced lawsuits in Colorado state courts to enforce and collect liquidated damages from shareholders who did not meet their delivery obligations for the 2007 crop year. Subsequently, on September 17, 2008, Plaintiffs Luft Farms, LLC and Allan and Connie Reuter, who are Colorado sugar beet growers and members of the Cooperative, filed a Class Action Complaint in this Court against the Cooperative on behalf of a class of sugar beet growers. The complaint alleges violations of the federal Agricultural Fair Practices Act as well as a number of state common law contract claims pursuant to supplemental jurisdiction under 18 U.S.C. § 1367.

The case centers on two provisions contained in the shareholder agreements to which Plaintiffs are bound: 1) liquidated damages for Plaintiffs' failure to meet its quota of sugar beets for the year, and 2) the term provision that automatically renews the contract from year to year. Plaintiffs ask the Court to enter a preliminary injunction prohibiting Defendant from enforcing these two contract provisions.

By way of background, in 2000, a group of sugar beet growers began efforts to acquire The Western Sugar Company from the English multi-national company Tate & Lyle. In June of that year, the Rocky Mountain Sugar Growers Cooperative was formed for the purpose of acquiring the assets. Response at 15. Representatives negotiated terms for the acquisition, set forth in a Memorandum of Understanding dated October 12, 2000 ("Offering Memorandum"), which is attached to the Motion as Exhibit A and to the Response as Exhibit 3. On April 30, 2002, The Western Sugar Company was

merged into the Rocky Mountain Sugar Growers Cooperative, which changed its name to The Western Sugar Cooperative.

According to Plaintiffs, the Offering Memorandum stated that members of the new cooperative would enter a new uniform Growers' Agreement. Motion at 3-4. Instead, however, the Cooperative renewed the uniform agreements previously used by the Western Sugar Company. Motion at 5. Those agreements were for a three-year term, made no mention of liquidated damages, and were terminable by the grower for any reason by February 1 of the applicable crop year. Motion at 4; Ex. E.

Plaintiffs claim that "at and for some time after the growers had committed to the Cooperative by financing its acquisition, they had no inkling that they could be subjected to liquidated damages without having a corresponding right to terminate their membership." Motion at 4. They rely heavily on the following statement in the Offering Memorandum: "Following the Acquisition we intend to conduct the business of Western substantially as it has been historically operated." Offering Memorandum at 2.

However, the Offering Memorandum did make clear some of the obligations that the Plaintiffs contest. To become a member of the Cooperative, each person or entity had to acquire one share of Common Stock, which entitled a shareholder to one vote. Response at 17. The Offering Memorandum provided, on the same page as the statement that Plaintiffs emphasize, the following statement:

> Ownership of one share of Patron Preferred Stock would both entitle and obligate you to deliver one acre of sugar beets for processing to [the Cooperative] each year . . . . If you purchase Patron Preferred Stock, you will be required to enter into a Uniform Grower's Agreement, obligating you to deliver one (1) acre of sugar beets to the Cooperative each year for each share of Patron Preferred Stock you purchase.

Offering Memorandum at 2; *see also* Response at 22-23.  The Offering Memorandum also provided: "It is anticipated that the Board of Directors will develop rules dealing with the failure of members to deliver the quantity of sugar beets reflected by their Patron Preferred Stock."  Offering Memorandum at 19.

The Offering Memorandum also contained provisions that informed potential shareholders of restrictions on transfer and termination.  One such provision stated that "any farmer-producer desiring to reduce its acreage will need to sell some of its Patron Preferred Stock to other farmer-producers in order to reduce its acreage."  *Id.* at 20.  The Offering Memorandum also provided, "We do not know whether there will be a market for the resale of the Patron Preferred Stock."  *Id.*  Finally, it informed prospective shareholders that shares could only be transferred with the consent of the Board of Directors.  *Id.* at 8.  In addition, Defendant notes that the provisions limiting termination were contained in the Bylaws, attached to the Offering Memorandum and part of the Shareholder Agreement.  Response at 21.  However, there was nothing explicitly giving Plaintiffs any notice of the automatic renewal provision that would eventually be entered into the shareholder agreements.

In 2003, the Cooperative created a new uniform growers' agreement ("Agreement") that contained new language with regard to renewal and liquidated damages.  Response Ex. 6.  The following provision addressed renewal:

> At the end of each crop year the term of this agreement shall automatically be renewed for an additional period of one (1) year so that at the commencement of each crop year, there shall be a term of one (1) year remaining, unless notice of termination shall have been given by the Cooperative to the Shareholder prior to the beginning of any crop year with termination effective as of the end of that crop year.

-4-

Agreement at 1.  The 2003 agreement also introduced a provision requiring members to pay liquidated damages to the Cooperative for failing to plant and deliver the quota of sugar beets.  Agreement at 2.  Defendant claims that the 2003 Shareholder Agreement and those for subsequent crop years were discussed at meetings between the Board of Directors and representatives of each growers' association before they were sent to shareholders for signature.  Response at 24.  Defendant also notes that the management of the Cooperative has always been directed by a board of directors that is comprised of shareholders of the cooperative.  Response at 16.  In addition, Defendant has submitted "evidence that Minn-Dak Farmers Cooperative - a sugar beet cooperative located in Wahpeton, North Dakota - has a Growers Agreement with automatic renewal, amendment, termination, share transfer, and liquidated damage provisions similar to those of the Cooperative."  Rebuttal Declaration of November 19, 2008 at 2; *see also* Ex. 2.

Plaintiffs Allen and Connie Reuter became initial shareholders and signed without objection Shareholder Agreements for Crop Years 2003, 2004, 2005, 2006, and 2007, which contained the same renewal and liquidated damages provisions.  Response at 26-31.  Plaintiff Luft Farms, LLC did the same.  Response at 31-35.  At the time of the filing, Plaintiffs stated that the Reuters had satisfied their obligation of delivery of sugar beets until 2007 but would fall short in 2008 and would be assessed $200,260 in liquidated damages on the 527 acres that would not be delivered.  Motion at 6; Response at 31.  Luft Farms had fallen short in 2007, incurring $37,240 in liquidated damages for failing to deliver for 98 acres, and would fall short and suffer liquidated

damages again in 2008, to be assessed damages for the forty-five acres that would not be delivered at $380 per share.  Response at 35.

Since 2007, growers have found it very difficult to lease land for the growth of sugar beets or to sell their shares due to market conditions.  Plaintiffs attached to their reply numerous declarations demonstrating the difficulty of selling the shares or even paying someone to take the shares.  *See* Reply Ex. A-E.  The difficulty is exacerbated by the requirement of the purchaser to assume the obligation to produce the quota of sugar beets.  Motion at 6.  Plaintiffs claim that the damages will result in insolvency for many shareholders.  Reply at 6-8.  Defendant responds, "During the period of 2003 - 2008, there has been a market for the sale and purchase of shares of Patron Preferred Stock.  During the period of 2003 - 2008 shareholders permanently transferred 25,769 shares of Patron Preferred Stock in 422 transfers."  Response at 20.  This includes 49 permanent transfers of a total of 2,520 shares in 2007 and 58 permanent transfers of a total of 3,389 shares in 2008.  Rebuttal Declaration of November 19, 2008 Ex. 1 at 8.

Plaintiffs assert that prior to 2003, they had no knowledge of the additional requirements that were imposed on them in the shareholder agreements that they signed starting in 2003.  The only supporting evidence they provide is a declaration by Michael Vasa, one of the members of their class.  *See* Reply at 9-10; Ex. 1.  They accuse Defendants of an "abrupt substitution of an onerous contract to replace the far more reasonable agreement in effect before (and for a crop year after) the acquisition of Western Sugar Company."  Reply at 6.  They accordingly allege violations of the

Agricultural Fair Practices act and state contract common law, and they ask the Court to enjoin Defendant from enforcing the shareholder agreement provisions in question.

## ANALYSIS

### A. Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003). The primary purpose of a preliminary injunction is to preserve the status quo pending a final determination of the parties' rights. *Otero Savings and Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 277 (10th Cir. 1981).

Ordinarily, "[t]o obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Urban Gorilla*, 500 F.3d at 1226. However, "[w]hen the evidence shows that defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1036 (10th Cir. 1993) (quoting *Atchison T. and*

*S.F. Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981)).  When a statute provides for injunctive relief, plaintiffs "only need to show that the statutory conditions for the issuance of an injunction were met."  *Mical Commc'ns*, 1 F.3d at 1036.

The Agricultural Fair Practices Act, under which Plaintiffs have brought their claim, does provide for a preliminary injunction as a remedy: "Whenever any handler has engaged or there are reasonable grounds to believe that any handler is about to engage in any act or practice prohibited by section 2303 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved."  7 U.S.C. § 2302(a).  In *Butz v. Lawson Milk Company*, 386 F. Supp. 227 (N.D. Ohio 1974), the court issued an injunction based solely on a finding of a violation of the AFPA without conducting the traditional four-factor analysis.  *Id.* at 240.

However, after *Butz*, the Supreme Court found that when a statute provides for an injunction as a remedy, a court can still exercise its equitable discretion and is not necessarily required to issue an injunction for statutory violations.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313-20 (1982).  "[T]he comprehensiveness of [ ] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Id.* at 313 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).  The Plaintiff in *Weinberger* had sought an injunction under the Federal Water Pollution Control Act, which authorized the

administrator of the EPA "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order . . . ." *Id.* at 317 (quoting 33 U.S.C. § 1319(b)). The Court found that the "grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 313.

The Court distinguished *TVA v. Hill*, 437 U.S. 153 (1978), finding that "[t]he purpose and language of the statute under consideration in *Hill*, not the bare fact of a statutory violation, compelled that conclusion [that an injunction was required]." *Weinberger*, 456 U.S. at 314. It found that the Endangered Species Act's flat ban on the destruction of critical habitats had required an injunction to uphold the explicit provisions of the Act. *Id.* (citing *Hill*, 437 U.S. at 173). The Court concluded that, in contrast, an injunction was not the only way to ensure compliance with the FWPCA. *Id.* The Court found that the provision in question made "clear that Congress did not anticipate that all [violations] would be immediately enjoined." *Id.* at 317-18. The Court thus overturned the First Circuit, which had vacated a district court holding refusing to issue an injunction after balancing the harms in equity. *Id.* at 309-11.

The Tenth Circuit relied on *Weinberger* in an unpublished opinion to call into question the lesser standard for a statutory injunction that it had previously articulated in *Lennen*:

> In this case, the district court concluded that [movant] Rothberg was not required to demonstrate irreparable harm because LSAC engaged in a

prohibited act under the ADA. While we recognize that "Congress may intervene and guide or control the exercise of the courts' discretion" regarding how injunctions are issued for violations of federal statutes, our circuit precedent does not make it clear that Congress did so through the ADA. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (referring to equity jurisdiction in stating, "we do not lightly assume that Congress has intended to depart from established principles"). We need not resolve the issue here, however, because, as explained below, even if irreparable injury to Rothberg should be presumed from a potential statutory violation we conclude that the balance of harms does not favor Rothberg.

*Rothberg v. Law School Admission Council, Inc.*, 102 Fed. App'x 122, 125 (10th Cir. 2004); *see also O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 389 F.3d 973, 1025 (10th Cir. 2004) (McConnell, J., concurring) (finding that "the normal standards [for a preliminary injunction] remain in place unless Congress clearly manifests an intent to modify them").

Other cases in the Tenth Circuit have followed *Weinberger* to find that the inclusion of an injunction as a statutory remedy does not take away courts' jurisdiction in equity. In *Garcia v. Board of Education of Albuquerque Public Schools*, 520 F.3d 1116 (10th Cir. 2008), the Tenth Circuit found that a district court may "choose to withhold relief despite a demonstrated (or, in this case, assumed) statutory violation if it has a valid basis in equity for doing so." *Id.* at 1128. It concluded, "Given that IDEA contains no such unequivocal statement altering the courts' equity jurisdiction, a district court's discretion encompasses the ability to deny relief based on equitable considerations." *Id.* In *Prows v. Federal Bureau of Prisons*, 981 F.2d 466 (10th Cir. 1992), the Tenth Circuit found that "under appropriate circumstances, the district court may justifiably withhold injunctive relief altogether even though the law has been violated by the party sought to be enjoined." *Id.* at 468 (citing *Weinberger*, 456 U.S. at 313, 320).

However, in neither of these cases was there any record of the district court's analysis of the four traditional factors. Instead, the district court had relied on other equitable factors in denying the injunction that had been sought. In *Prows*, the district court had refused to return the plaintiff to a particular correctional facility because of safety concerns. 981 F.2d at 468. In *Garcia*, the district court had refused to grant an injunction for compensatory educational services for a student because of her refusal to attend school and the demonstrated likelihood that she would not take full advantage of any award the court might have granted. 520 F.3d at 1131. The court had also focused on the purpose of the statute in fashioning appropriate relief. *Id.* at 1128-30. Moreover, in cases coming after *Weinberger* and involving statutory language similar to that in question in *Weinberger* and in the present case, the Tenth Circuit has affirmed the lower standard for a statutory injunction articulated in *Lennen*. *See Commodity Futures Trading Comm'n v. Wall Street Underground, Inc.*, 128 Fed. App'x 726, 729 (10th Cir. 2005); *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004); *Mical Commc'ns*, 1 F.3d at 1035; *cf. Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

The lack of clarity in Tenth Circuit precedent led Judge Miller of this District to conduct the four-part analysis for a statutory injunction after noting the "uncertainty regarding the standards for issuance of the requested injunctive relief." *United States v. Colo. Mufflers Unlimited, Inc.*, 03-cv-1310-WEM-CBS, 2007 WL 987459, at *4 (D. Colo. Mar. 30, 2007). He did so despite citing *Lennen* and *Mical Communications* for the proposition that "upon statutory grant of authority to issue injunctions, the traditional

equitable factors, including a showing of irreparable harm, need not be proved." *Id.*

The matter at hand does not require me to reconcile fully this lack of clarity, nor does it require me to conduct the full four-factor analysis. I find that the circumstances of this case do not warrant a preliminary injunction under either standard. Nonetheless, I do find that *Weinberger* and Tenth Circuit precedent support the proposition that a court may exercise its equitable jurisdiction where an injunction is not the only way to fulfill the statutory purposes. In this case, the AFPA does not require an injunction as the only way to fulfill its statutory purposes. Like the language in question in *Weinberger*, the AFPA merely lists an injunction as one of various forms of relief available to a plaintiff suing under the act. *Compare* 7 U.S.C. § 2302(a); *with Weinberger*, 456 U.S. at 314 ("An injunction is not the only means of ensuring compliance. The FWPCA itself, for example, provides for fines and criminal penalties." (citing 33 U.S.C. §§ 1319(c) and (d))). Accordingly, I find that I am entitled to exercise my full equitable jurisdiction and to consider equitable factors in deciding whether to issue a statutory injunction in this case. *See Prows*, 981 F.2d at 468; *Garcia*, 520 F.3d at 1128, 1131. However, even under the lesser statutory injunction standard articulated in *Lennen* and its progeny, I find that Plaintiffs have not demonstrated a violation of the AFPA.

Accordingly, I will limit my analysis to whether there is a violation of the AFPA and other equitable factors that affect my ruling. I note that were I to conduct a full four-factor analysis, because Plaintiffs seek a disfavored injunction, their heightened burden would require them to "make a strong showing both with regard to the likelihood of

success on the merits and with regard to the balance of harms." *Urban Gorilla*, 500

F.3d at 1226 (quotation omitted). A movant must meet this heightened burden when

seeking any of the disfavored categories of preliminary injunctions, including injunctions

that alter the status quo, injunctions that are mandatory as opposed to prohibitory, or

injunctions that afford the movant substantially all of the relief he may recover at the

conclusion of a full trial on the merits. *See O Centro*, 389 F.3d at 975.[1] Courts must

more closely scrutinize these injunctions "to assure that the exigencies of the case

support the granting of a remedy that is extraordinary even in the normal course." *Id.*

Plaintiffs' desired injunction is disfavored because it seeks to alter the status quo.

"[T]he status quo is the last uncontested status between the parties which preceded the

controversy until the outcome of the final hearing." *Dominion Video Satellite, Inc. v.

Echostar Satellite Corp.* 269 F.3d 1149, 1155 (10th Cir. 2001) (quotation omitted). In

the present case, Plaintiffs are seeking to alter the status quo, which is the enforcement

of contract provisions and assessment of liquidated damages, which occurred in 2007.

Plaintiffs argued at the hearing that in fact they are preserving the status quo by

preventing their financial insolvency. I do not find this argument persuasive and find

that the status quo, under the law, does not refer to their financial status but rather the

enforcement of contract provisions previously agreed to by the parties and thus binding

on the parties. Accordingly, if I were to undertake the traditional four-part analysis,

because Plaintiffs seek a disfavored injunction, they would have to make a strong

---

[1] As to the latter category,"all of the relief" to which a plaintiff may be entitled has been interpreted to mean "that the effect of the order, once complied with, cannot be undone." *Prairie Band of Potawatomi Indians*, 253 F.3d 1234, 1248 (10th Cir. 2001) (quotation omitted).

showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and Plaintiffs' failure to demonstrate a violation of the AFPA would inform the analysis of likelihood of success on the merits.

In conclusion, I will proceed under the lesser statutory injunction standard, but because I retain equity jurisdiction, I will exercise discretion in considering equitable factors.  Furthermore, my analysis is guided by the extraordinary nature of a preliminary injunction.

**B. Alleged Violation of the AFPA**

The AFPA, in relevant part, makes it unlawful for any handler knowingly to engage or permit any employee or agent to engage in "coerc[ing] any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers," 7 U.S.C. § 2303 (a), or "coerc[ing] or intimidat[ing] any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with the handler . . . ."  § 2303 (c); *see also Mich. Canners and Freezers Assoc., Inc. v. Agric. Mktg. and Bargaining Bd.*, 467 U.S. 461, 471 (1984) ("[J]ust as the Act forbids processors to interfere in a producer's decision to become or remain affiliated with an association, it also forbids an association of producers to interfere in that decision by coercing producers to belong to, or participate in a marketing contract with, the association.").  The definition of handler includes any association "contracting or negotiating contracts or other arrangements, written or oral, with or on behalf of producers or associations of producers."  § 2302(3)(A); *Mich. Canners*, 467 U.S. at 476.  Thus, the AFPA forbids

cooperatives such as Defendant to coerce producers to join, remain in, or enter contracts with them.

Plaintiffs argue that the alleged unilateral insertion of the liquidated damages provision and automatic term renewal provision in 2003 constituted coercion in violation of the AFPA. They argue, "By itself, each provision is enough to impose intense pressure on growers to make no attempt to terminate their membership and to plant their acreage, regardless of how unprofitable it may be; together, their impact is overwhelming." Motion at 10. They emphasize the recently collapsed market for shares in the Cooperative, arguing, "The inevitable consequence of attempting to exit the Cooperative - the Cooperative's threat - is substantial economic loss or insolvency." Reply at 7.

There is very little jurisprudence on the AFPA in general, and very little indication of what constitutes coercion under the statute. One court attempted to define coercion, and it did not provide a unified definition, instead suggesting that coercion is: 1) compulsion by force or threat, 2) something more than pressure, and 3) something leaving one no choice but to take a given course of action. *Bybee Farms, LLC v. Snake River Sugar Co.*, 563 F. Supp. 2d 1184, 1196 (E.D. Wash. 2008). In *Bybee Farms*, the plaintiffs alleged that they were coerced to stop growing sugarbeets by statements that the cooperative in that case would collapse one of its districts after three years by requiring plaintiffs to pay for services that were provided to the cooperative at no cost at the time of the statements. *Id.* The court noted, "The AFPA does not define the term 'coerce.' As a result, the Court must give the word its ordinary and natural meaning."

*Id.* The court proceeded to use Black's Law Dictionary to define "coerce" as "compel by force or threat." *Id.* (quoting Black's Law Dictionary (8th ed. 2004)). It then stated, "The issue, then, is whether . . . statements were so threatening that objective listeners in the plaintiffs' position reasonably would have felt compelled to cease growing sugarbeets." *Id.* In applying its definition, the court found that a rational jury could find that Plaintiffs felt pressured by the statements, but that "pressure is not the same as coercion." *Id.* The court then noted that the policy change was still three years away, the change still required approval of the Board of Directors, and two of the partners continued growing sugarbeets despite the applied pressure. *Id.* The court concluded that "an objective person in the plaintiffs' position would have been unable to conclude during the Winter of 2005 [ ] that he had no choice but to cease growing sugarbeets." *Id.*

Plaintiffs cite *Michigan Canners*, the only Supreme Court case addressing the AFPA, as defining coercion as "improper pressure," but I find this reading of the decision to be inaccurate. In quoting the language from the AFPA's legislative history that included this terminology, the *Michigan Canners* Court was not attempting to define coercion but rather clarifying the acts prohibited by § 2303. The Court quoted the Senate report as saying, "The objective of the bill is to protect the producer in the exercise of a free choice. . . . To protect his free choice he should also be protected from improper pressure in the other direction, that is, improper pressure to join an association." 467 U.S. at 474 (quoting S. Rep. No. 474, 90th Cong., 1st Sess., 5 (1967)). The Court also stated, "Similarly, when Senator Aiken introduced the bill on the floor of the Senate, he stated that the bill 'is designed to protect the agricultural

producer's right to decide, free from improper pressures, whether or not he wishes to belong to a marketing or bargaining association.'" *Id.* (quoting 113 Cong. Rec. 21411 (1967)).  The intent of the Court was not to elaborate on the definition of coercion but rather the finding that the AFPA protected both the grower's choice to join an association and his choice to remain independent.  *See id.* at 471.  However, as I will further elaborate below, even if I were to adopt this low threshold and define coercion as "improper pressure," I find that Defendant's conduct has not risen to the level of coercion.

In *Michigan Canners*, the Supreme Court held that a Michigan law violated the AFPA.  The Court found:

> The Michigan Act . . . empowers producers' associations to do precisely what the federal Act forbids them to do.  Once an association reaches a certain size and receives its accreditation, it is authorized to bind nonmembers, without their consent, to the marketing contracts into which it enters with processors.  In effect, therefore, an accredited association operating under the Michigan Act may coerce a producer to 'enter into [or] maintain . . . a marketing contract with an association of producers or a contract with a handler' - a clear violation of § 2303(c).  In addition, although the Michigan Act does not compel a producer to join an association, it binds him to the association's marketing contracts, forces him to pay fees to the association, and precludes him from marketing his goods himself.  In practical effect, therefore, the Michigan Act imposes on the producer the same incidents of association membership with which Congress was concerned in enacting § 2303(a).

467 U.S. at 477-78 (footnote and citation omitted).

While *Michigan Canners* is analogous to the case at hand because it involved what essentially amounts to required membership or required contract obligations, it is still distinguishable from the present case.  In *Michigan Canners*, the law in question gave producers' associations the authority to bind nonmembers to their marketing

contracts and forced nonmembers to pay association fees.  *See id.*  In the present case,

however, there is nothing that binds nonmembers of the cooperative.  *Cf. Newark*

*Gardens, Inc. v. Mich. Potato Indus. Comm'n*, 847 F.2d 1201, 1206 (6th Cir. 1988)

(distinguishing *Michigan Canners*, in which associations could bind nonmembers to

marketing contracts, from the case at hand, in which producers and shippers of potato

products were required to pay fees to the Michigan Potato Industry Commission).

Rather, the question in the present case is whether contract provisions to which

members assented coerced Plaintiffs to join and remain in the cooperative.

Furthermore, two of the cases that Plaintiffs cite in making their argument that

the two provisions constitute coercion are decidedly distinguishable.  Plaintiffs attempt

to analogize the conduct found coercive in *Ripplemeyer v. National Grape Cooperative*

*Association*, 807 F. Supp. 1439 (W.D. Ark. 1992), to the present case.  In *Ripplemeyer*,

the court found that the plaintiffs in that case survived summary judgment when they

> specifically alleged coercion and intimidation by defendants to obtain the
> cancellation or termination of plaintiffs' membership agreements and
> marketing contracts.  Plaintiffs also contend that offers and monetary
> inducements were made by defendants, encouraging plaintiffs to cease to
> belong to the producers' association.  These allegations, if proven to be
> true, involve the precise conduct Congress sought to ban with the
> passage of the AFPA.

*Id.* at 1455.  The facts in this case do not approach the direct forms of coercion and

intimidation that the plaintiffs in that case encountered.  *See id.* at 1456 (describing

examples of alleged intimidation, which included monetary inducements and intimidating

phone calls, letters and personal visits).

Plaintiffs also attempt to analogize their situation to a handler's refusal to deal with a milk producer who had joined a cooperative in *Butz*. *See* 386 F. Supp. 2d 227. In *Butz*, a contract provision affording the handler the right to cancel its contract upon the producer's entry into an agreement with a cooperative was found to violate the AFPA, because such a provision "can only be interpreted as coercive against a producer's right to join and belong to an association." *Id.* at 240. It is difficult to draw any analogy between those circumstances and the ones in the present case, as the present case involves alleged coercion by a cooperative to gain and keep members.

Even adopting the most favorable standard for the Plaintiffs, the facts of the present case do not amount to coercion under the AFPA. While Plaintiffs claim that the Cooperative imposed new contract provisions on its members unilaterally in 2003, they were in fact on notice of many aspects these provisions as early as 2000. First, with regard to limits on transferability, the Offering Memorandum included a provision stating that "any farmer-produced desiring to reduce its acreage will need to sell some of its Patron Preferred Stock to other farmer-producers in order to reduce its acreage." It also stated, "We do not know whether there will be a market for the resale of the Patron Preferred Stock." Finally, it informed prospective shareholders that shares could only be transferred with the consent of the Board of Directors. With regard to the liquidated damages provision, the Offering Memorandum detailed the obligation to fulfill a delivery quota, and its statement that "[i]t is anticipated that the Board of Directors will develop rules dealing with the failure of members to deliver the quantity of sugar beets reflected by their Patron Preferred Stock" should have put Plaintiffs on notice of the possibility of

liquidated damages. Thus, the only aspect of which the Plaintiffs did not have any notice until 2003 was the renewal provision.

More importantly, Plaintiffs signed shareholder agreements every year from 2003 to 2007 without objection. The only point at which they felt "coerced" to stay in the Cooperative was starting in 2007, when the market collapsed and they were unable to fulfill their obligations. Thus, even if the Defendants inserted new provisions in the 2003 shareholder agreement and without notice to the Plaintiffs, Plaintiffs' argument is not viable considering that they stayed in the Cooperative and signed the agreements without objection five times annually. *See Bybee Farms*, 563 F. Supp. 2d at 1196 (finding no coercion where two partners decided to continue growing sugarbeets despite applied pressure).

I also note, in finding that the provisions in themselves are not coercive, that such provisions do exist among other cooperatives. In *Bybee Farms*, one of the contracts contained an obligation to produce a certain amount of sugarbeets, and this provision was not in question in the case. *See* 563 F. Supp. 2d at 1188. Furthermore, Defendant has provided evidence of similar contract provisions in the Minn-Dak Cooperative. Accordingly, I find that the facts of this case do not amount to coercion under the AFPA.

**C. Equitable Consideration**

The issuance of an injunction is an extraordinary remedy, and accordingly I do not exercise my equitable powers lightly. Whether or not Plaintiffs' delay in waiting from 2003 to 2007 to take action amounts to laches, I do find that such a delay does weigh against them in my balancing of the equities. An injunction to disrupt a contract is not

warranted where the side claiming that certain provisions are somehow coercive has repeatedly signed renewed versions of that contract with the same provisions for several years without complaint.

Once again, I do not find it necessary to proceed further with analysis of any other factors that are traditionally involved in preliminary injunction analysis. Because I find that Defendants have not demonstrated coercion under the AFPA, they have not met the lowest standard possible for a statutory injunction, which is simply to demonstrate a violation of the statute in question. Furthermore, the AFPA analysis informs whether Plaintiffs have demonstrated a likelihood of success on the merits, and because they seek a disfavored injunction, their heightened burden requires them to make a strong showing with regard to this factor. Accordingly, my inquiry ends here.

**CONCLUSION**

Based upon the foregoing, it is hereby

ORDERED that Plaintiffs' Motion for Preliminary Injunction [doc. #10, filed October 27, 2008] is **DENIED**.

Dated: February 20, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge